## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MYRON CANTRELL JONES,     *
(AIS: # 237921)        *
                          *
    Petitioner,       *
                          *
vs.                  * CIVIL ACTION NO.13-00012-WS-B
                          *
GARY HETZEL,         *
                          *
    Respondent.       *

### Report and Recommendation

Myron Cantrell Jones, a state inmate in the custody of Respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. (Doc. 1). The petition was referred to the undersigned Magistrate Judge for a report and recommendation following remand from the Eleventh Circuit Court of Appeals. The undersigned previously issued a report and recommendation finding that Jones' habeas petition should be dismissed as time-barred. (Doc. 13). The report and recommendation was adopted by the district court (doc. 17); however, on appeal before the Eleventh Circuit, the case was remanded for a determination of whether the petition was timely filed under 2244(d)(1)(D). (Doc. 27). Following remand, the parties were directed to submit supplemental briefing on the timeliness issue. (Doc. 30). Jones and the Government filed supplemental briefs. (Docs. 31, 32). In addition, Jones filed a

motion seeking permission to expand the record. (Doc. 33).

In his motion, Jones seeks to expand the record to add "new evidence" in the form of an "affidavit video" transcript and a handwritten sworn affidavit purportedly executed by Demaris Davis. In the transcript, Davis states that she and Michael Booker have a child together, that she and Booker were present in Queens Court on December 12, 2001 when the shootings in question took place, that she does know who did the shootings, that she did not see Jones give Shanta Phillips a gun, that Booker left her to go speak with Earl Manassa in a field, and that she cannot say whether whatever Booker is saying is true or false. The Davis handwritten affidavit merely reasserts some of the allegations contained in the transcript. Jones contends that the Davis documents offer a different narrative that supports his assertion that Booker gave perjured testimony during his trial. Upon consideration, the undersigned **grants** Jones' motion to expand the record to add the Davis "affidavit video" transcript and handwritten affidavit; however, neither document supports Jones' argument before this Court.

The undersigned has conducted a careful review of the record, the parties' supplemental briefs, and the Davis' transcript and handwritten affidavit, and finds that no evidentiary hearing is required to resolve this case. Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317 (11th Cir. 2004). Upon

careful consideration, it is recommended that this action be dismissed his action be dismissed and that judgment be entered in favor of Respondent on all claims.

## I. BACKGROUND FACTS

Jones was indicted in Mobile County Circuit Court, on February 14, 2003, for capital murder of K.B., a child less than 14 years of age, in violation of Alabama Code 13A-5-40(a)(15), and four counts of attempted murder in violation of Alabama Code §§ 13A-6-2 and 13A-4-2. (Doc. 9 at 2; Doc. 9-1 at 56). As set forth in the opinion of the Alabama Court of Criminal Appeals:

> The evidence presented by the State at trial
> established that on December 11, 2001, Prichard police
> were involved in a shooting incident with four young
> black men in a public housing community known as
> Alabama Village, resulting in two of the men being
> killed and one injured. Later in the day, a group of
> 15 to 20 angry young men gathered in Queens Court[1],
> another public housing community in Prichard, and
> discussed retaliating against the Prichard Police.
> Octavia Kendrick, the manager of Queens Court,
> observed the angry mob of approximately 15-20 people
> gathering and was able to identify several of the men
> who were in the group including Earl Manassa, Lamont
> Graves, Willie Pearson, Vander Gilmore and Myron
> Jones. Kendrick telephoned Prichard's police chief,
> Sammy Brown, and told him what she had observed, and
> to tell him that she had overheard threats made
> against his police officers. Specifically, she
> reported that one of the threats that she overheard
> indicated that if the police came into that area of
> town, "they would be shot at."

---

[1] Several witnesses testified that Queens Court was a high crime area, was known for frequent gunfire, and was commonly visited by people who do not live there for the purpose of dealing in drugs and prostitution. (Doc. 9-12).

The testimony at trial established that many people in the black community were upset over the shootings at Alabama Village, and the police received several other threats of possible retaliation. Because of these threats, Prichard police officers were directed to ride in two-man units on December 12, 2001.

On the afternoon of December 12, the police dispatcher received a call of "shots fired" in Queens Court. Lieutenant Nettles, Officer Lewis, Officer McCarroll and Officer LaP[o]rte were dispatched to Queen Court to further investigate the call. When the officers arrived, Lieutenant Nettles asked some teenage boys who were outside one of the apartments whether they had heard any gunshots. The boys, who were playing dice and gambling with Monopoly money, informed Nettles that they had not heard any shots fired. At that time, a woman came out of an apartment unit, told one of teenagers to come with her, and stated, "You all better come on in the house before. . .[t]he police do to y'all [w]hat they did [to] the folks over in Alabama Village." A man, who was later identified as Michael Booker, then walked from behind a "U-Haul" rental that was parked in front of one of the units and stated that they had not heard any gunfire. Nettles then noticed that everyone was walking away, and he sensed that something was amiss. He instructed the other officers to get into their police cars and told them, "let's go." As the officers attempted to leave the neighborhood in their police cars, a "barrage of gunfire" was released upon them from all sides. Several of the shots hit their police cars, and a bullet fragment struck Officer LaPorte in the neck, causing long-term nerve damage.

The police officers and other witnesses testified that there were numerous shots fired and that it sounded as if the gunshots were coming from different caliber weapons. Gunshots were fired into vehicles in the area and into neighboring homes and apartments, including the Bonham's home where six-year-old Kearis Bonham was living with his grandmother, Martha Bonham and other family members. Martha Bonham and her family were preparing to leave home and go to a Christmas banquet, when Martha asked Kearis to get something out of her car. Kearis was outside when the

shooting started. After the shooting stopped, Niki Bonham, Kearis's aunt and Martha's daughter, walked onto the front porch and tripped over Kearis's body. Kearis had been shot in the head and died instantly.

Forensic testing of four fired cartridge castings which were found in Queen's Court after the shooting established that some of the bullets were fired from a high-powered, semi-automatic rifle, such as an AK-47, or SKS. The bullets were designed to penetrate metal. Shotgun pellets were also recovered from walls and floors in an apartment and were identified as being single-aught buckshot.

The State's key witness was Michael "T.D. Cat" Booker. Booker was incarcerated at Yazoo City Federal Correctional Facility at the time of trial serving a sentence for a counterfeiting conviction. His testimony from a previous trial revealed that Booker had been a crack cocaine addict for several years and that he supported his drug addiction by stealing. [2] Booker testified that he had been in and out of jail for several years and had most recently been convicted of felony charges in state and federal court, including burglary, theft, and counterfeiting. Booker stated that he was in Queens Court on December 12, 2001, trying to sell some stolen electronics and furniture out of a "U-Haul" rental truck. Booker claimed that he and his girlfriend, "Reon," were also packing their things and preparing to move to New Jersey, because he believed his probation would be revoked as a result of new counterfeiting charges that had been brought against him. Booker stated that he sold a stolen TV and VCR to a woman in Queen Court when he saw "Pete"[3] and asked if he wanted to purchase

_____

[2] Booker was also the pivotal State's witness in the trial of co-conspirator Shanta Phillips. This Court may take judicial notice of its own records. *Hull v. State*, 607 So.2d 369, 371 (Ala. Crim. App. 1992)(Doc. 9-2, footnote 3).

[3] This person was Willie "Pete" Pearson. In a statement Booker gave to police, he stated: "Earl 'Quick' Manassa, Shanta 'Yab' Phillips, and Myron 'P.J.' Jones and Willie 'Pete' Pearson discussed retaliating against the Prichard Police for a shooting incident that occurred the day before involving Speedy and Keen Bay in Alabama Village Housing Project." (Doc. 9-2, footnote 4).

any of the stolen items. Pete told him that he did not have any money but that Earl "Quick" Manassa would probably purchase some of the items. Booker stated that he and Willie started walking toward Earl Manassa, when Manassa fired an AK-47 rifle several times into the air. Booker stated that Reon tried to convince him to leave Queen Court because they had heard Manassa state earlier in the day that they were going to get the police for shooting his partner. Booker stated that Shanta "Yab" Phillips, "a lot of girls [and] a couple more guys" were standing there with them when Manassa made his threats. Booker testified that after Manassa fired the shots Myron "P.J." Jones came out of one of the apartments with another AK 47, an Uzi gun, and a pistol. Booker witnessed Jones give the Uzi - a small automatic machine gun — to Shanta Phillips just moments before the police arrived. As the police were leaving Queens Court, Booker heard someone at the other end of Queens Court holler, "They are pulling off," and immediately thereafter, according to Booker, the police were fired upon. Booker saw no one with weapons but Jones, Phillips, and Manassa. Booker stated that after the shooting stopped he and his girlfriend got in the U-haul and drove up to the intersection leaving Queens Court and saw that one of the officers had apparently been shot. Booker and Reon proceed to I-65 and drove towards Saraland—then continuing to Birmingham, before going on to New Jersey. Booker stated that he had known Manassa, Jones and Phillips for several years.

On Cross-examination, Booker testified that after he fled to New Jersey, his mother kept calling him and telling him that Investigator Charles Huggins was coming by the house repeatedly looking for him. Booker stated that he telephoned Huggins and spoke with him by telephone in February 2002. (Doc. 9-12, footnote 5 omitted). Booker testified that he had learned by this time that a child had been killed in the shooting. Booker testified that the police and district attorney investigators later came to New Jersey to interview him. Booker later returned to Alabama where he was arrested and his probation was revoked. (Doc. 9-12, footnote 6 omitted)

After Booker's probation was revoked, he was placed in the Escambia County Jail. Booker testified

that Shanta Phillips was in the same jail and that Phillips offered him money if he would not testify. Booker testified that he was told by a family member that the police were looking for a Michael Booker who, it had been reported, was selling weapons out of the back of the U-Haul truck on December 12, 2001. Booker denied having any involvement in shooting at the police officers. Booker stated that he agreed to testify of his own volition and not for his own benefit.

On redirect, Booker stated that he had truthfully testified in the Manassa trial, the Phillips trial, and was truthfully testifying in the instant trial. Booker, who claimed that he had gotten his life together in New Jersey, stated that his cooperation with the State had made his life worse, not better. Because of his cooperation, Booker said that he was back in prison, spending 23 hours a day in an isolation cell for his protection, deprived of many of the privileges available to the general prison population, and essentially "cut off" from his family. Booker testified that despite these bad circumstances, he appeared in court to testify because when a child is killed, somebody needs to stand up and testify as to what they saw. Booker testified that he was absolutely certain that he saw Earl Manassa, Shanta Phillips and Jones with weapons only seconds before he heard gunfire, and the police were fired upon.

The state also called Harold Sykes, a former resident of Queens Court to testify. Sykes testified that he and his stepfather rode into the neighborhood on bicycles on December 12, 2001, that as they approached they heard several gunshots, and that when they arrived they were told that a child had been shot. Sykes stated that, minutes after he heard the gunshots, he saw Earl Manassa holding a large black and chrome gun, and that he saw Myron "P.J." Jones go into some bushes on two occasions and pick something up, acting as if he did not want anyone to see him. He did not see what Jones picked up, but Jones placed the item or items into his pocket very quickly. Sykes stated that the gunfire came from the general direction of the U-Haul truck. Sykes testified that Phillips and Manassa were together all the time. Sykes also stated that Jones, too, was frequently with

Manassa and Phillips.

(Doc. 9-12 at 5-10).

The jury found Jones guilty of capital murder and four counts of attempted murder as charged in the indictment, and on October 21, 2004, he was sentenced to life in prison without the possibility of parole for the capital murder charge and to life on each of the attempted murder charges, to run consecutively. (Doc. 9 at 3; Docs. 9-1 at 14, 57, 59, 61, 63, 65). On appeal to the Alabama Court of Criminal Appeals, Jones' conviction and sentence were affirmed in an unpublished memorandum opinion on May 20, 2005. (Doc. 9-12). Jones did not file a motion for rehearing or a petition for writ of certiorari to the Alabama Supreme Court. A certificate of judgment was issued on June 8, 2005. (Doc. 9-13).

On May 26, 2006, Jones filed a Rule 32 petition, which the trial court denied as meritless on September 26, 2006. (Doc. 9-14). Jones appealed the dismissal and on appeal, the Alabama Court of Criminal Appeals affirmed the trial court's dismissal on June 22, 2007. (Doc. 9-18). Jones' application for rehearing was overruled on July 13, 2007. (Doc. 9-20). On July 22, 2007, Jones filed a petition for writ of certiorari to the Supreme Court (doc. 9-21), which the court granted on January 23, 2008. (Doc. 9-22). Subsequently, on May 23, 2008, the Alabama Supreme Court issued an order quashing the previously granted writ of

certiorari and issued judgment on the same day. (Doc. 9-23).

On March 23, 2011, Jones filed a second Rule 32 petition alleging newly discovered evidence, namely the affidavit of Michael Booker, the state's key witnesses at trial. (Doc. 9 at 7). In the affidavit, Booked recanted his trial testimony. (Id.). The state denied the allegations, and moved for an evidentiary hearing and dismissal of Jones' petition. (Id.). An evidentiary hearing was conducted on March 1, 2012, during which Booker testified that while he signed the affidavit, the assertions contained therein were false, and the affidavit was executed due to threats and the payment of money. (Id.). The trial court credited Booker's trial testimony and testimony at the hearing over the assertions in the affidavit, and denied Jones' petition as meritless. (Id.). Jones appealed, and in an order dated August 10, 2012, the Alabama Court of Criminal Appeals affirmed the trial court's denial of Jones' second Rule 32 petition. (Doc. 9-29). On September 14, 2012, Jones' petition for rehearing was overruled. (Docs. 9-30, 9-31). On November 12, 2012, the Alabama Supreme Court denied Jones' petition for writ of certiorari and issued judgment on the same day. (Doc. 9-33, 9-34).

On January 10, 2013 [4], Jones filed the instant habeas

---

[4] Under the mailbox rule, absent contrary evidence, a prisoner's motion is deemed filed on the date it is delivered to prison officials for mailing. Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001).

petition challenging his conviction and sentence. (Doc. 1 at 13).
Jones raises one claim, namely, that newly discovered evidence
exists that the prosecution knowingly used false evidence during
his trial. (Id. at 7). In its response, Respondent argues that
Jones' petition should be dismissed as untimely because it was
filed outside of the statute of limitations. (Doc. 9 at 8). As
noted *supra*, Jones' federal petition was initially dismissed as
untimely; however, the Eleventh Circuit Court of Appeals found
that the Court did not consider whether Jones petition was timely
under 2244(d)(1)(D); thus, the case was remanded. (Doc. 27).

In Respondent's supplemental brief, Respondent argues that
Jones failed to prove that he exercised due diligence; thus, his
petition should be denied. (Doc. 31). Respondent further argues
that *assuming arguendo* that Jones' petition was timely filed, his
claim should nevertheless be denied because it lacks merit.
(Id.). In his reply, Jones contends that he exercised 'due
diligence', and that given his incarceration, he should not be
required to engage his family members or other outside sources in
an investigation, and he had no way of discovering that Booker
had recanted his trial testimony before receiving the Booker
affidavit. (Doc. 32). Jones further argues that his claim that
the prosecutor knowingly provided false evidence in the form of
Booker's testimony constitutes a constitutional violation; thus,
his claim should succeed on its merits. (Id.).

Upon careful review of Jones' petition, and the parties respective briefs and supporting documents, the undersigned finds that *assuming arguendo* that Jones could establish that he exercised due diligence with respect to discovery of the Booker affidavit[5], he has failed to establish a basis for habeas relief. Accordingly, his petition should be denied because it is without merit.

## II. STANDARD OF REVIEW FOR HABEAS CORPUS RELIEF

This court may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Section 2254(d) provides that "habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless

---

[5] Jones essentially argues that he discovered that Booker had recanted his testimony on March 15, 2011 when he received the affidavit, and that prior to receipt of the affidavit, he had no way of knowing that Booker would recant the false testimony that he offered under oath at trial. (Doc. 22)

the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254(d)(1), (2).

> A state-court decision is contrary to the Supreme Court's clearly established precedent (1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. See Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1519-20, 146 L. Ed. 2d 389 (2000).

> A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 120 S. Ct. at 1520. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000). Moreover, the burden of rebutting a presumption of correctness of the state courts' decision by clear and convincing evidence is on the petitioner. 28 U.S.C. § 2254(e); Hill v. Linahan, 697 F. 2d. 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.") (citing Henson v.

<u>Estelle</u>, 641 F. 2d 250, 253 (5th Cir. 1981)).

With the grounds of review established, the court will now address Jones' claims.

**III. ANALYSIS**

Pursuant to 28 U.S.C. § 2244 (d)(1), as amended by the April 24, 1996 enactment of The AEDPA, a state prisoner seeking a federal habeas corpus remedy must file his federal petition within one year of the "conclusion of direct review or the expiration of the time for seeking such review." [6] The Act provides that:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitations period shall run from the latest of–
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court,

---

[6] Section 2254 was amended by the AEDPA, which became effective April 24, 1996. <u>Henderson v. Campbell</u>, 353 F.3d 880, 890 (11th Cir. 2003). Since Jones filed this petition on January 1, 2013, this action is governed by AEDPA.

if the right has been newly recognized by
the Supreme Court and made retroactively
applicable to cases on collateral review;
or

(D) the date on which the factual
predicate of the claim or claims presented
could have been discovered through the
exercise of diligence.


(2) The time during which a properly filed
application for State post-conviction or other
collateral review with respect to the pertinent
judgment or claim is pending shall not be counted
toward any period of limitation under this
subsection.

28 U.S.C. § 2244 (d).

As noted *supra*, the undersigned finds that *assuming arguendo*
that Jones' petition is timely under § 2244(d)(1)(D), it is
nevertheless due to be dismissed because it lacks merit. Jones
raises a single claim in the instant habeas petition – that newly
discovered evidence establishes that the prosecution knowingly
used false evidence during his trial. (Doc. 1). In support of
this claim, Jones relies on the Booker affidavit, as well as the
Davis affidavits. (Docs. 9-26 at 18-19, 33 at 4-12).[7] In the
Booker affidavit, Booker asserts that he testified falsely when
he testified at trial that he heard Earl Manassa, one of Jones'
co-defendants, state that "they were going to get the police for

---

[7] In the instant petition, Jones has recreated the Booker
affidavit. However, an original copy of the affidavit can be
located in the state records provided by Respondent. See Doc. 9-
26 at 18-19.

14

shooting his partner" and that he observed Earl Manassa firing an assault rifle, Jones in possession of several guns, and Jones giving Shanta Phillips, another of his co-defendants, a gun. (Id.). The Booker affidavit further asserts that Booker did not see Jones nor any of his co-defendants in the location of the shootings on the day in question, and that he gave the false testimony at trial in exchange for potentially favorable treatment in his then pending criminal cases. (Id.).

During the state court's review of Jones' second Rule 32 petition regarding the Booker affidavit, the trial court conducted an evidentiary hearing to question Booker about the affidavit.[8] (Doc 9-26 at 41-53). Under oath, Booker testified that he was paid to sign the affidavit by the girlfriend of Shanta Phillips, one of Jones' co-defendants, that the statements contained in the affidavit were false, and that the testimony he gave at trial was true. (Id.). He further testified that he had been threatened by a variety of people connected to Jones and/or his codefendants. (Id.). The trial court found Booker's testimony at the evidentiary hearing to be credible, and issued an order denying Jones' Rule 32 petition on the following grounds:

> "Petitioner called Michael Booker (hereinafter referred to as BOOKER) to the stand in support of his assertion that Booker signed an affidavit recanting his trial testimony implicating the Petitioner. Booker testified that he signed the affidavit in

---

[8] Jones was represented by counsel at the evidentiary hearing.

question, but only after a [co-defendant's]
girlfriend gave Booker the affidavit, already
completed[,] and paid him $1,300.00 (one thousand
three hundred) dollars. Booker further testified that
he and his family have been continuously threatened
by the co-defendant and/or people known to the co-
defendant, with the most recent being a text-message
sent to his cell phone threatening to kill him.

Booker also testified that while pumping gas at a
service station with one of his young children in the
car, he was approached by an associate of one [of]
the co-defendants who stated that he "ought to blow
you right here." Booker took that as a threat on his
life, but believes the associate saw his young child,
and that is the only reason he was not killed that
day. Booker also testified that he lives in absolute
fear due to the harassment and threats that he has
received because of his trial testimony in these
cases. Booker testified that he in fact signed the
affidavit because of the threats and money, but he
testified truthfully during the trial of this matter
and the recantation contained in the affidavit was a
lie.

The Petitioner shall have the burden of proving by a
preponderance of the evidence the facts necessary to
entitle him to relief. R. 32.3. Here, the Petitioner
was allowed an opportunity to present evidence to
support his allegation that the State's key witness,
Booker, had recanted his trial testimony in this
matter and in fact, this Court finds that the conduct
testified to by Booker as to the co-defendants in
this case, to be quite concerning. This Court finds
that Booker testified truthfully during the trial of
this matter and testified truthfully at the
evidentiary hearing and believes his testimony to be
credible and believable.

Accordingly, this Court is authorized to dismiss this
claim as being without merit because the Petitioner
has failed to meet his burden of proving by a
preponderance of the evidence that Booker's trial
testimony was false and/or that Booker recanted his
testimony.

(Doc. 9-26 at 31-32). The Alabama Court of Criminal Appeals

affirmed the denial of the petition, stating:

> On appeal, Jones reiterates the claims raised in his petition and asserts the fact that Booker signed an affidavit recanting his trial testimony, then testified that his recantation itself was a lie, means that the petitioner should receive a new trial because Booker's testimony at the evidentiary hearing and at trial was not credible.
>
> However, "The burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State." Davis v. State, 9 So. 3d 514, 519 (Ala. Crim. App. 2006), rev'd on other grounds, 9 So. 3rd 537 (Ala. 2007). "[I]n a Rule 32, Ala. R. Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence." Wilson v. State, 644 So. 2d 1326, 1328 (Ala. Crim. App. 1994). Rule 32.3, Ala. R. Crim. P., specifically provides that "[t]he petitioner shall have the burden of… proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." "[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001). "However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, "[t]he standard of review on appeal… is whether the trial judge abused his discretion when he denied the petition." Boyd v. State, 913 So. 2d 1113, 1122 (Ala. Crim. App. 2003)(quoting Elliot v. State, 601 So. 2d 1118,1119 (Ala. Crim. App. 1992)).
>
> The petitioner was afforded an opportunity to prove the claim in his petition. The circuit court found that he had not met his burden of proof. This decision was within the discretion of the circuit judge and is supported by the record. For the foregoing reasons, the denial of the petition is affirmed."

(Doc. 9-26 at 5-6).

    As noted *supra*, this court will not grant relief on a claim

that has been adjudicated on the merits by the state courts unless the decision rendered was contrary to, or an unreasonable application of, clearly established federal law. See 42 U.S.C. § 2254(d)(1). Having reviewed the record in this case, the undersigned finds that the state courts' determination that Jones did not meet his burden of proof with regard to his claim that Booker's trial testimony was false was reasonable, and not contrary to clearly established federal law.

Moreover, in order to succeed on a claim that a prosecutor knowingly suborned perjury, "the defendant must demonstrate that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material". Duckett v. McDonough, 701 F. Supp. 2d 1245, 1259 (M.D. Fla. Mar. 25, 2010)(citing United States v. Dickerson, 248 F.3d 1036, 1041 (11th Cir. 2001))(internal quotation marks and citations omitted). If a claim is only based on the petitioner's own suppositions and accusations and inconsistent and unreliable testimony, it is not enough to establish a due process violation. Duckett, 701 F.Supp. at 1259 (citing Boyd v. Allen, 592 F.3d 1274, 1307-08 (11th Cir. 2010)).

To meet his burden of proof in the instant case, Jones relies first on the Booker affidavit, and then the Davis materials. With respect to the Booker affidavit, extant case law

provides that recantation testimony is "properly viewed with great suspicion", as it "upsets society's interests in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." Duckett, 701 F. Supp. at 1260 (citing Dobbert v. Wainwright, 458 U.S. 1231, 1233-34, 105 S. Ct. 34, 82 L. Ed. 2d 925 (1984))(additional citations omitted). In general, a witness' recantation of trial testimony will justify a new trial only where the reviewing judge is satisfied that the recantation is true and that it will likely result in a different verdict. Id. The courts consider a witness' recantation in addition to his trial testimony and in the context in which he recanted when assessing the likely impact it would have on jurors. Taite v. Stewart, 2016 WL 4154257, *12, 2016 U.S. Dist. LEXIS 103755, *35-36 (S.D. Ala. June 28, 2016)(citing Jones v. Taylor, 763 F.3d 1242, 1248 (2014)).[9] Indeed, courts have noted that when a witness recants a recantation, the untrustworthiness increases exponentially. Jones v. McNeil, 2013 WL 5504371, *5,

---

[9] In Taite, the court highlighted some of the indicators of unreliability with respect to recanted testimony. Among these are recantations made in conclusory or general terms; those authored by the petitioner with the recanting witness only providing their signature; suspect timing of the recantation; and a recanting witness that has "little to lose and more to gain" by his recantation. Taite, 2016 WL 4154257 at *12; 2016 U.S. Dist. LEXIS 103755 at *39. (citations omitted).

2013 U.S. Dist. LEXIS 141746, *12 (N.D. Fla. Oct. 1, 2013).

In the instant case, Michael Booker testified under oath at the evidentiary hearing, and recanted the recanted testimony contained in his affidavit. (See Doc. 9-26 at 41-52). While he admitted that he signed the affidavit recanting his trial testimony, at the evidentiary hearing, he testified that he was provided a pre-typed affidavit, and was paid $1300 to sign it. (Id.). He further testified that he had been threatened numerous times as a result of his trial testimony and that he fears for both his safety and the safety of his family. (Id.). As found by the trial court, Booker's testimony at the evidentiary hearing raised significant doubts as to the veracity of his affidavit. Further, Booker's trial testimony was consistent with that of other trial witnesses, such as Octavia Kendrick, the manager of Queens Court. At trial, Kendrick testified that on the day in question, she reported to law enforcement that she had observed a mob of angry men, that included Jones, and at least one of his co-defendants, discussing retaliating against the Prichard Police Department because of an earlier shooting in another housing project. (Doc. 9-12 at 5-10). Additionally, trial witness Harold Sykes testified that on the day in question, he heard gunshots as he approached the area, and minutes later, he observed Earl Manassa, one of Jones' co-defendants, holding a gun, and he observed Jones retrieve two items from the bushes although he

could not see what they were. (Id.). Given this trial testimony, and Booker's testimony at trial and at the evidentiary hearing, the state courts did not err in finding that Booker's affidavit was not credible. Further, there is absolutely nothing in Booker's affidavit, nor in any of Booker's court testimony, that remotely suggests that the prosecution knowingly offered false testimony through Booker.

The only other evidence provided by Jones in the instant case is an affidavit and "affidavit video" transcript of Demaris Davis, who is identified as the mother of Michael Booker's child. (Doc. 33). In both the transcript and the affidavit, Davis avers that she was present on the day of the shooting, that she did not hear Jones' co-defendant say that he was going to 'get the police', that she did she see anyone with guns, and that she does not know who did the shooting. (Id. at 6-11). She also avers that Booker was not by her side throughout the incident, that she does not know what Booker did or did not see, and that following the incident, she and Booker relocated to New Jersey. (Id.). Further, while Davis asserts that law enforcement traveled to New Jersey to speak to her and Booker, she makes no assertion that law enforcement encouraged her or Booker to testify falsely or that they had any reason to question the information that either she or Booker provided. *Assuming arguendo* that Davis' transcript and affidavit are credible, they failed to support Jones' claim

that the prosecution knowingly presented false testimony.

## CONCLUSION

The record clearly shows supports the state courts' finding that the Booker affidavit was not credible. Thus, this Court cannot conclude that the finding of the state court constituted an unreasonable application of clearly established federal law. Further, Jones has failed to come forth with credible evidence to support his claim that the prosecution knowingly presented false testimony. Therefore, he is not entitled to habeas relief. Accordingly, the undersigned recommends that this Jones' petition be **DENIED,** and that this action be **DISMISSED** with prejudice.

## Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); **Fed.R.Civ.P.** 72(b); S.D. ALA. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was

informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." *11th Cir. R. 3-1.*

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **11th** day of **August, 2017.**

_____
**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**